

**SO ORDERED.**

**SIGNED this 17 day of November, 2005.**

_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| EARL C. MILLS | ) | Case No. 03-43341 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| EARL C. MILLS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 04-7012 |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| INTERNAL REVENUE SERVICE | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant United States' Motion for Summary Judgment.[1] Plaintiff, Earl C. Mills (Mills), has filed a response to the motion. The United States, acting through the Internal Revenue Service (IRS), did not file a reply, and the time for doing so has now expired. The Court has reviewed the briefs submitted by the parties and is now prepared to rule. This matter constitutes a core proceeding,[2] and the Court has jurisdiction to decide it. The Court denies the motion for summary judgment, and the matter is now set for trial.

## I.    FINDINGS OF FACT

Mills initiated this adversary proceeding seeking a determination that his federal income tax obligations for the years 1987 through 1998, now totaling $1,727,813,[3] are dischargeable in this Chapter 7 bankruptcy. The Bankruptcy Code permits a debtor to discharge income taxes in Chapter 7 for a period that is at least three years before the bankruptcy filing, if the applicable returns were filed at least two years before the bankruptcy case, the returns are not fraudulent, and the debtor has not willfully attempted, in any manner, to evade or defeat the otherwise dischargeable taxes. IRS contends that Mills did willfully attempt to evade or defeat his taxes for those years, and, therefore, the taxes are nondischargeable pursuant to 11 U.S.C. § 523(a)(1)(C).[4]

---

[1] Doc. 54.

[2] 28 U.S.C. § 157(b)(2)(I).

[3] In addition to these potentially dischargeable taxes, IRS has filed a Proof of Claim showing Mills owes over $38,000 as a civil penalty for what is likely trust funds taxes due for the first quarter of 1998, and another approximately $57,000 in income tax liabilities that were last due within three years before the date of the filing of the petition and are excepted from discharge under 11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(I). This Adversary Proceeding does not question the non-dischargeability of those taxes.

[4] All statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (2004), unless otherwise specified.

The basic facts underlying this case are not really in dispute. Mills is a neurosurgeon who obtained his medical degree in 1969 and has been actively employed as a neurosurgeon since at least 1976. During the twelve year period at issue in this case, his adjusted gross income ranged from a low of $84,392 in 1997 to a high of $434,003 in 1990, with an average annual income of $255,243.[5] His AGI over this period of time totaled $3,062,914, with a tax due on returns in the same period totaling $557,762.13, or only 18.2% of his AGI. In 1998, Mills closed his private practice and took a salaried position at Howard University, where he worked until the end of 1999 for an annual salary of $300,000.

During this same period, Mills was married to another physician who had annual also available to support their family of four (consisting of Drs. Mills and their two children, who were born in approximately 1983 and 1986) in amounts in the $120,000 to $150,000 range. Mills also was in the Amway business, and records reflect his receipt, during some period, of another $3,000 per month attributable to that business venture. This translated into monthly gross income to support their family of anywhere from $44,000 to $54,000 per month during at least portions of the time period in question.[6]

In August 2000, Mills took a position at the Wichita Clinic in Wichita, Kansas for an annual salary of $350,000-$393,000. At the time of the filing of this bankruptcy in 2003, Mills' Schedule I reflected monthly gross income of $37,171.60, which would equal approximately $446,000 per annum. Mills also earns substantial additional income by doing medical consulting, in addition to the Wichita Clinic salary; he projected $45,000 in consulting income for 2003. Accordingly, at the time he filed this bankruptcy petition,

---

[5] During the time frame at issue, Mills was married, but elected to file singly.

[6] Mills also does consulting that he estimated, on schedules filed in this case, would result in $45,000 additional income for 2003. The record is unclear whether Dr. Mills earned consulting income in the 1987-1998 period.

3

it appears his 2003 income may have been in the one-half million dollar range. It is also relevant to note this is Dr. Mills' second bankruptcy, the other one having been filed in Maryland in approximately 1990.[7]

Mills ultimately filed a tax return for each year in question, although eight of the twelve returns were filed late.[8] During most of that time period, Mills was apparently self employed, and thus required to pay estimated tax payments on a quarterly basis. Mills did not pay those estimated taxes[9] as they became due throughout the tax year, nor did he pay the balance due on the returns when the returns were ultimately filed.

For the years 1987 to 1998, Mills incurred income tax liabilities in the sum of $557,762.13, excluding interest and penalties. IRS contends that Mills had more than adequate income available to him to pay these taxes as they became due, and before interest and penalties accrued, but that he made the choice, instead, to live an extravagant lifestyle. IRS relies, in part, on Mills' decision to purchase, and then continue to own, certain pieces of expensive real estate (including owning three separate houses simultaneously during a significant part of the relevant time frame—at least 1989 to 1995) to support its position. Specifically, IRS contends that the following transactions are evidence of Mills' decision to

---

[7] It appears that Mills' Chapter 11 case was pending over four years, but that it was dismissed in 1995.

[8] Mills filed his 1987 and 1988 tax returns on July 26, 1991; his 1989 tax return on August 26, 1991; his 1990 tax return on November 8, 1991; his 1991 tax return on October 7, 1992; his 1992 tax return on November 19, 1993; his 1994 tax return on April 15, 1995; his 1995, 1996 and 1997 tax returns on April 15, 1998; and his 1998 tax return on April 15, 1999.

[9] The evidence before the Court does not reflect how much of the required estimated taxes were paid in any given tax year, if any, but it is clear that all the required estimates could not have been paid, or he would not have amassed a $1.7 million tax liability. IRS contends Mills made no voluntary payment on his federal tax liabilities after 1995. The Court is unsure whether that fact is contested, or not, because of Mills' habit, in his response, of grouping numbered factual paragraphs together, and glossing over specific facts in favor of generalizations. It appears this fact is tacitly admitted, however, because Mills only refers to one payment made in 1993.

4

continue a lavish lifestyle, instead of choosing to have a very comfortable lifestyle while also paying his tax obligations:

1. In 1978, Mills purchased a house in Rockville, Maryland for approximately $216,000. Mills lived there for approximately four years and required a mortgage payment of approximately $1,800 per month. Mills then rented the property to his wife's parents for monthly rent of approximately $300 (and he thus paid the remaining $1,500 monthly mortgage payment) until the property was foreclosed in 1995. The estimated fair market value of the property in 1993 was $700,000. There is no evidence in the record why these individuals required support, or if support was necessary, why they required such a high-dollar residence, or why they could not have resided with the Mills.

2. In 1980, Mills purchased a house in Potomac, Maryland for $545,000.[10]

3. In 1983, Mills purchased a townhouse in Bethesda, Maryland requiring a monthly mortgage payment of approximately $2,325. Mills allowed his wife's sister to live in this property for $500 a month in rent (while he paid the remaining $1,825 of the required payment) until the property was foreclosed in 1995. The estimated fair market value of the property in 1993 was $350,000. Again, there is no evidence why Mills was obligated to support this person, or if necessary to provide her support, why she required such a high-dollar residence, or why she could not have resided with the Mills.

---

[10]The record does not establish what became of this property.

4.  Also in 1983, Mills purchased a second home, in Potomac Falls, Maryland, for approximately $600,000, which is where Mills and his immediate family lived. In 1987, Mills sold this house for $1.4 million.

5.  In February 1989, Mills purchased another home in Potomac, Maryland for $2.8 million.[11] He used the $800,000 "profit" from the sale of the Potomac Falls home as a down payment on this 8,000 square foot, eight bedroom, ten bathroom house.[12] The mortgage on the home required a monthly payment of approximately $25,000.[13] The estimated fair market value of the home in 1993, six years after he had acquired it, was $3.1 million. The loan on the house was also foreclosed in 1995 when he stopped making the required payments.

6.  From 1995 until 2000, Mills rented property in Potomac, Maryland for $5,500 to $6,000 per month.[14] This home had the approximate same square footage as the $3.1 million home (8,000 sq. ft.).[15]

---

[11] The real estate contact for this property was signed in October 1987, pursuant to IRS Exhibit 27, with a down payment of $256,000 (Exhibit 28), but the sale was apparently not closed until February 1989 as a result of construction problems.

[12] It is interesting to note that by February 1989, when the sale on this $2.8 million house finally closed, Mills had not paid his 1987 taxes ($26,423) or his 1987 taxes ($26,891). Rather than using less than 7% of the $800,000 profit (or about 20% of the $256,000 escrow payment) to satisfies the 1987 and 1988 tax liabilities, he apparently decided to use the entire $800,000 as a down payment on what Ms. Mills describes as her "dream home."

[13] The record indicates that the mortgage on this home actually required payment of $24,560/month rather than $30,000. Mills, for a time, doubled up on mortgage payments when he got behind, so there was some period when his mortgage payments on all three homes likely exceeded $30,000.

[14] Mr. Mills and Mrs. Mills' depositions give conflicting amounts.

[15] *See* Mrs. Mills' deposition at p. 39.

6

7. Upon moving to Wichita, Kansas in 2000, Mills first rented a 4,000 square-foot house for $5,000 per month.

8. In May 2003, Mills purchased a 6,000 square-foot, five-bedroom house in Wichita, Kansas for $370,000, which required a monthly mortgage payment of $5,627.14, not including real estate taxes and insurance.[16] This home has an elevator and a swimming pool, although there is nothing in the record indicating that anyone living in this home has any disabilities.

IRS also cites several other purchases, transactions and living expenses to support its position that Mills chose to enhance, or at least maintain, his lifestyle instead of paying his income taxes, including:

1. Mills throughout the years in question paid living expenses of his wife's parents (and at least the housing expenses of a sister-in-law for some portion of time).

2. In 1988, Mill purchased approximately $17,075 worth of antiques for his home.[17]

3. Mills purchased a new Mercedes Benz automobile in 1982 and another in 1984, as well as a 1987 model year van and a 1987 model year Jeep in December 1986.

---

[16] Mills' schedule I shows his homeowner's insurance equals $900 additional a month, and $200 is required for home maintenance. Real estate, vehicle taxes and "priority taxes" are combined on the schedule and equal $600 per month. The Court thus cannot determine how much of the $600 is for real property taxes, but assumes it is at least $300/month, for approximately $1,400 on top of the $5,627 mortgage payment. It appears only two people may live in this home on a regular basis, as tuition to two colleges appear in the record. It also appears Mills may have made a $40,000 down payment on the purchase of his Wichita home in 2000, although the record is not entirely clear. *See* Mills' answer to Interrogatory No. 2 The Court also could not find in the record whether this is a 15 or 30 year mortgage, or something in between.

[17] The receipt produced appears to suggest the August 1988 purchase of antiques totaled $13,707. Another receipt shows another $10,000 spent at Antique Art Gallery in 1983. Again, the undisputed evidence is that Mills' 1988 tax liability reported on his return was $26,891.00. Theoretically, if Mills had chosen to pay even $13,707 towards his 1988 tax liability, instead of towards antiques, his tax liability for 1988 would have been substantially less for that year.

7

4. Mills purchased artwork in the 1980s for approximately $50,000, and apparently has never liquidated that art in an attempt to pay ongoing, or past due, taxes.[18]

5. Mills' children attended private schools for a time when the family lived on the East Coast.

6. Mills belonged to a country club in Wichita, Kansas and he paid for his wife's personal trainer at a cost of $480/month for some period of time in 2003.

7. Mills and his wife took a trip to Hawaii in 2004 at a cost of over $4,000.

8. Mills hired an interior decorator for approximately $350.

9. In 2001, when his tax liability well exceeded a million dollars, Mills donated over $23,000 to his church.

Mills has responded to many of these allegations, claiming IRS has "scant facts" to support its assertions. He argues that many of the identified purchases and expenses took place prior to 1987, when these tax obligations arose, and thus could not be evidence of a willful failure to pay during the years in question. Mills also states that he tried to dispose of at least one of the properties in the Washington, D.C. area, but that a downturn in the real estate market made disposing of the properties impractical. Further, Mills points out that his children stopped attending private schools when his family moved to Kansas, that his donations to his church are motivated by religious beliefs and not an attempt to evade his taxes, and that his membership in the country club no longer exists.[19] He contends he joined the country club merely to

---

[18]In Mills' previous bankruptcy, Case No. 90-42725, filed in the District of Maryland, he indicated he owned personal property of "an aggregate value of $130,000." Government Exhibit 20. In this bankruptcy, he values his one-half interest in art at $15,000. In Mills' deposition, he contends at some unstated date, he had had the art appraised at $40,000. Mills Deposition at pages 50-51.

[19]The record seems to suggest he joined the club when he first moved to Wichita in 2000, and that he was still a member until at least November 2004, the date when his wife testified in her deposition that they were currently members. *See* Mrs. Mills' deposition at page 94.

8

build business contacts upon moving to Kansas. Finally, Mills claims that many of the expenses, such as a payment of $350 to an interior decorator, are so de minimus that they do not support IRS's position.

Additional facts will be discussed below, when necessary.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[20] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[21] An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[22] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[23]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[24] In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the

---

[20]Fed. R. Civ. P. 56(c). Fed. R. Civ. P. 56(c) is made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7056.

[21]*Lifewise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir. 2004); *Loper v. Loper (In re Loper)*, 329 B.R. 704, 706 (10th Cir. BAP 2005).

[22]*Thom v. Bristol-Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[23]*Id.* (citing *Anderson,* 477 U.S. at 248).

[24]*Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

9

movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[25]

If the movant carries this initial burden, the nonmovant who would bear the burden of persuasion at trial may not simply rest upon his pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[26] To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[27] Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[28]

**III. ANALYSIS**

A debtor under Chapter 7 of the Bankruptcy Code is generally granted a discharge from all debts that arose before the filing of the bankruptcy petition. Exceptions to discharge are to be strictly construed in favor of debtors.[29] The objecting creditor, here the IRS, bears the burden of proving by a preponderance of the evidence that the debtor's taxes are nondischargeable.[30]

---

[25] *Id.* (citing *Celotex,* 477 U.S. at 325).

[26] *Id.* (citing Fed. R. Civ. P. 56(e)).

[27] *Diaz v. Paul J. Kennedy Law Firm,* 289 F.3d 671, 675 (10th Cir. 2002).

[28] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[29] *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1302 (10th Cir. 1996).

[30] *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

10

Certain debts are excepted from discharge under 11 U.S.C. § 523, including any debt "for a tax or custom . . . with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax . . . ."[31] Evidence of nonpayment alone does not, however, support a finding that a tax debt is nondischargeable.[32] To defeat the discharge of the tax debt, the creditor must prove that the debtor willfully attempted to evade or defeat the tax, and that proof must contain both a "conduct" element, that the debtor has attempted in any manner to evade or defeat tax, and a "mental state" element, that he has acted willfully.[33] The conduct required is that the debtor attempted in any manner to evade or defeat a tax, which can include either affirmative conduct or acts of culpable omission. The willfulness required under § 523(a)(1)(C) is met if the actions are done voluntarily, consciously, or knowingly and intentionally.[34]

Interwoven into the Court's analysis is the underlying policy that § 523(a)(1)(C) should be applied in such a fashion as to best promote its purpose of limiting discharge to the honest but unfortunate debtor.[35] Thus, the late filing of returns, or the failure to pay taxes as they became due, due to mistake, inadvertence or an honest misunderstanding would not, without more, constitute a willful attempt to evade or defeat a tax. Conversely, conduct found to be sufficient for a finding of willful tax evasion under § 523(a)(1)(C)

---

[31] 11 U.S.C. § 523(a)(1)(C).

[32] *Dalton v. Internal Revenue Service*, 77 F.3d at 1301 and *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir. 2000).

[33] *Landi v. United States (In re Landi)*, 316 B.R. 363, 366 (M.D. Fla. 2004).

[34] *Dalton v. Internal Revenue Service*, 77 F.3d 1297 at 1302.

[35] *In re Sommers*, 209 B.R. 471, 479 (Bankr. N.D. Ill. 1997) (citations omitted); *Dalton v. I.R.S.*, 77 F.3d at 1300-01 (quoting legislative history noting the purpose of this section is to provide relief for the financially unfortunate, and not to create a tax evasion device).

could include the combination of unexcused late-filed returns and significant understatement of income.[36] As the Court understands the evidence, there is no dispute that Mills had a duty to file returns and pay taxes, and that he knew he had such a duty.

It is important to note that in order for a debt to be non-dischargeable under § 523(a)(1)(C), the debtor does not have to have acted with a bad purpose or an evil motive.[37] A tax can be found non-dischargeable under § 523(a)(1)(C) if the debtor has elected to pay creditors other than his tax creditors and to purchase discretionary items rather than address his tax obligation. When a debtor has made the conscious choice to pay other debts and purchase luxury items or an expensive home, instead of paying an admitted tax liability, he can be said to have acted willfully under § 523(a)(1)(C).[38] As stated in *United States v. Angel*,[39] the Court must distinguish

> "... between the debtor with the present ability to pay who so refuses and the unfortunate debtor without a present ability to repay. Debtors with an inability to pay their taxes with no more culpability will have their tax debts discharged. However, debtors who have cash in hand and, instead of responding to their tax obligations, choose to pay other creditors or purchase luxury items and expensive homes will have their tax debts excepted from discharge.[40]

---

[36]*Berzon v. United States (In re Berzon)*, 145 B.R. 247, 250 (Bankr. N.D.Ill. 1992).

[37]*See In re Wright*, 191 B.R. 291, 293 (S.D.N.Y. 1995).

[38]*See, e.g., In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994) (finding debtor had the wherewithal to file his return and pay his taxes, but he did not fulfill his obligations to do so) and *In re Landi*, 316 B.R. at 370 (finding willfulness demonstrated when debtors (one of whom was vascular surgeon) failed to pay estimated taxes or to pay any income taxes with their tax returns, notwithstanding their ability to maintain a lavish lifestyle, including using their substantial income and proceeds from sale of real estate to build 10,000-square-foot six bedroom/ten bathroom dream home and to support their respective parents).

[39]1994 WL 69516 (Bankr. W.D. Okla. 1994)

[40]*Id.* at *4.

12

The Court finds that the following four, admittedly overlapping, factors should be considered when deciding whether Mills is an unfortunate debtor who simply was unable to pay his taxes, as they became due, or a debtor who had adequate funds, but instead chose to pay others. The Court will analyze these under a "totality of the circumstances" standard, which is required because direct proof of an intention to evade or defeat taxes may be difficult to establish.

First, the Court should consider under what circumstances the tax obligations arose. For example, over what period of time did the taxes arise? Was it a one-time occurrence, or a pattern of accumulation of tax obligations? Was there some unexpected, and unavoidable, reduction in income or increase in expenses that caused a debtor to suddenly become unable to meet all his financial obligations, such as job loss or illness, or an employee's embezzlement of funds?

Second, once the tax obligation first arose, did the debtor take steps to ensure that his ongoing expenses were reasonable and necessary in light of his available income (after payment of taxes attributable to that income)? For example, did the existing level of the debtor's lifestyle pre-date the unpaid tax obligations, or did the lifestyle become more extravagant (or continue to be extravagant) while the tax obligations were accruing? If his lifestyle did not become more extravagant, did debtor take reasonable steps to decrease expenses so as to be able to meet ongoing liabilities? In this case, IRS contends that Mills should have simply sold one or all of the homes he owned in the Washington D.C. area to save on the large monthly mortgage payments (and the taxes, insurance, and upkeep associated therewith). IRS

13

also contends that Mills should have sold the properties occupied by his wife's relatives to save on the large mortgage payments required to retain those additional homes.[41]

Mills has responded that he attempted to sell at least the $3.1 million home at some point after he acquired it, but that the real estate market had fallen and he was unable to sell it.[42] If Mills did in fact take reasonable steps to sell the properties to eliminate the large mortgage payments, but was unable to do sell the property due to no fault of his own, or could only sell the property at a loss (such that it would not net income for payment of tax liabilities or if such sale would result in negative tax consequences not offset by mortgage savings), then that fact would be relevant to the issue of whether he willfully failed to pay the taxes that came due after he was unable to sell the property.

Third, the Court should look at the particular debtor's awareness of his tax situation and whether he is financially savvy enough to understand the consequences of his spending choices. In other words, was the debtor acting in good faith surrounding the tax obligations? For example, a highly educated debtor, such as Mills, might well be held to a higher standard than a less educated debtor. In addition, a higher income debtor, who could well afford professional tax counseling provided by a lawyer or accountant,[43] might be held to a higher standard than a lower income debtor.

---

[41]*See, e.g., In re Griffith*, 206 F.3d at 1396 (finding the transfer of assets to family members for insufficient consideration an indicia of willfulness).

[42]Mills suggests one reason he could not sell the $3.1 million home was because the tax laws changed after he purchased the home, restricting mortgage deductions to the first $1 million value. If true, that does not appear to provide an explanation for his failure to sell the other two homes properties resided in by relatives, which were each valued at less than $1 million.

[43]*In re Fretz,* 244 F.3d 1323 (11th Cir. 2001) (finding debtor, an emergency room physician, willfully evaded collection of taxes when he had adequate income to hire accountant to assist him with tax matters, but still failed to timely file returns). The record shows that Mills had both lawyers and accountants, both back East and in Wichita.

14

On that same subject, whether a debtor is making reasonable efforts to comply with all aspects of the Internal Revenue Code could well be relevant for the Court to determine the willfulness of a debtor's election not to pay his outstanding tax obligations as they become due. Was the debtor routinely timely filing tax returns, or was he making it difficult for the tax collectors by purposely requiring the collector to chase outstanding returns? Was the debtor, when he filed his tax returns, declaring all income earned, or was he requiring IRS to audit the return because of unexplained income purportedly received?[44] Was the debtor electing to pay some kinds of taxes, while choosing not to pay others, such as payment of "trust fund" type taxes that would not be dischargeable[45] in a personal bankruptcy versus income taxes that, after a certain period of time, might be? Was debtor taking deliberate steps to avoid accumulating assets that could be seized to satisfy his liabilities, such as by renting instead of purchasing assets?[46] Finally, what was the debtor's history with the IRS prior to the time he started not paying taxes? Had he always previously timely filed and paid, or had there been repeated collection problems, which might show that a particular debtor had a unique understanding of the consequences of not paying taxes?

---

[44] For example, there is some general assertion that Mills under-reported his income for the 1998 tax year, resulting in an audit and an increase in his ultimate tax liability for that year. *See, e.g., In re Jacobs,* 324 B.R. 376, 395 (Bankr. M.D. Fla.,2005) (stating the understatement of income for more than one tax year is one badge of fraud). The present record on this matter is vague. Mills admits he under-reported income, but alleges it was an innocent mistake.

[45] *Compare* the dischargeability of taxes under 11 U.S.C § 523(a)(1)(A), which references a § 507(a)(8)(C)(a) tax required to be collected or withheld and for which debtor is liable in whatever capacity, versus a § 523(a)(8)(A)(I) tax on income last due after the three year period before filing bankruptcy. Deposition transcripts provided by the parties suggest that Mills may have paid certain business taxes, while allowing his personal income taxes to accumulate, but again, the record is unclear. Mills deposition at page 89.

[46] *See* Haesloop *v. U.S.*, 2000 WL 1607316, *6 (Bankr. E.D.N.Y. 2000) (finding that although debtor earned approximately $275,000 per year, his bankruptcy case was administered as a "no asset" case because debtor deliberately structured his lifestyle and assets so as to preclude any meaningful attempt by IRS to collect on the tax debt other than through pursuit of his future income).

Finally, the Court should consider any other factors that might show intent, including the reasonableness of expenses paid in lieu of taxes. For example, it may not be reasonable for one debtor to send his child to private school while it could be perfectly reasonable for another to do so if he had a child with special needs, or if the public schools demonstrably failed to provide an adequate education.[47] Or, it might not be reasonable for a family of two to purchase a large, four wheel drive sport utility vehicle to drive around a large city, while it might be perfectly reasonable for a family of six who lives in a rural community to do so. Furthermore, homes typically cost more in the Washington, D.C. area than they do in Kansas, for example, and thus whether a given mortgage payment is reasonable may depend on the area where a debtor resides, and at what cost safe and comfortable housing is reasonably available. Although the Court well suspects Mills could have found safe, comfortable and affordable housing for considerably less than $25,000 per month, there was no evidence in the record of this fact.

In applying these factors to this case, the Court finds that although it is a close decision, summary judgment is not appropriate because of the required standard of review for summary judgment motions. Mills argues that there is no evidence he purposely sought to expand or increase his standard of living following the start of his tax problems in 1987; instead, he argues that by that time he already had a high lifestyle and that he was unable to extricate himself from the expenses that came with that lifestyle despite his well-intentioned efforts to do so.

---

[47]Mills also made a large contribution to his church at a time when he likely owed over $1 million to the IRS, which may or may not, after trial, be deemed reasonable. *See In re Lynch*, 299 B.R. 62, 75 (Bankr. S.D.N.Y. 2003) (finding that although a debtor (like any other American) is free to practice his religion as he sees fit, one cannot evade payment of tax obligations by making gratuitous transfers to religious and other charitable organizations before paying taxes, even if done with sincere motivation).

16

Part of the reason the Court finds that granting summary judgment at this stage is inappropriate is because Mills correctly notes that many of the purchases and expenses IRS relies upon to show willfulness occurred prior to, or around the same time as, when Mills' tax obligations began to accrue. The only expenditures IRS points to, which occurred after his tax problems began in 1987, essentially include those for the purchase of $17,000 in antiques, the purchase of the home in Wichita, the temporary use of a storage facility upon moving to Wichita, the country club membership for some time, and the purchase of several used, albeit expensive, automobiles upon the family's arrival in Wichita.[48] Mills has testified, by affidavit, as to each of these expenses, and if all inferences are made in the light most favorable to him, summary judgment is not appropriate. Mills has also presented evidence that he ultimately took steps to reduce his standard of living. Mills notes that the real estate market had fallen in the Washington, D.C. area, perhaps in part as a result of tax changes surrounding the deduction of mortgage interest, making the sale of multi-million dollar homes more difficult. He contends he in fact tried to sell the most expensive piece of property, but was unable to do so before it was eventually foreclosed. There is no evidence in the record to refute this contention.

Mills also took steps such as purchasing a much less expensive home when he moved to Wichita (which cost only 13% as much as the $2.8 million house in the D.C. area), sending his children to public school once they moved to Kansas, and buying used vehicles to replace two Mercedes Benz automobiles. On that same subject, he argues that although he admittedly purchased two new Mercedes Benz

---

[48]Again, there is a factual issue about when the $2.8 million home was purchased. Mills' response says it was purchased "in or around 1987, before his tax liabilities arose." (Emphasis in original) The other evidence in the record suggests the home was not actually purchased until 1989, by which time Mills owed at least $53,000 in federal taxes for 1987 and 1988.

17

automobiles in 1982 and 1984, several years before the tax problems at issue arose in 1987, that he and his wife then drove those automobiles until they moved to Wichita in 2000, at which time they could no longer be repaired.

The Court finds, for purposes of this summary judgment motion, that Mills did make some effort to marginally reduce his monthly expenses. IRS is free at trial to present evidence concerning the reasonableness of Mills' efforts, in light of his family income, and whether Mills could and should have done more to reduce his living expenses.[49] The uncontroverted evidence in this case does show that Mills incurred the tax obligations over a very long period of time, by simply, year after year, failing to pay his taxes as they became due. This is clearly not a case where Mills experienced an unexpected drop in earnings or incurred some unexpected expenses and needed a reasonable period of time to accept that he needed to adjust his standard of living so that he could afford to meet his tax obligations. The taxes in question in this motion span a period of twelve years in which Mills completely failed to pay his taxes. Although this factor certainly weighs in favor of the IRS, it is not sufficient, taken by itself, to allow the Court to rule, as a matter of law, that Mills willfully failed to meet his tax obligations.

Finally, there are numerous other questions that surround the evidence submitted by IRS that preclude summary judgment. For example, IRS relies upon the fact that Mills belonged to a country club in Wichita, Kansas as evidence of his lavish lifestyle. The amount spent at the country club is not itemized.

---

[49]IRS, for example, has done little analysis of the amounts Mills was paying for discretionary items upon his arrival in Wichita in 2000, when his income was high and the cost of living likely lower than it had been in Washington. How much did the family spend on meals out, on cleaning or yard services, on life insurance, on discretionary items for the children, on clothing and dry cleaning, on computers or cell phones, on car payments or insurance for those cars, on tuition for college-aged children, etc. Similarly, there is little explanation, outside of the size of the house payments, whether the rest of the Mills' expenditures prior to 2000 were reasonable.

18

Mills has responded that the country club membership was intended to assist his efforts in networking and building his medical practice following his move to Kansas (and not to evade taxes), and that he has since canceled that membership. IRS also notes that he paid for a personal trainer for his wife, to which Mills responds the trainer was only hired for a short period of time and was necessary for certain health reasons, which are undisclosed.[50] Again, for purposes of summary judgment, the Court must accepts Mills's explanation for these expenses and finds that, standing alone, they do partly negate IRS' contention that Mills willfully failed to pay his taxes.

Without going into each and every argument made by the parties, the Court finds that Mills has raised sufficient questions of fact to preclude summary judgment. The central issue here is whether Mills acted willfully in failing to pay his taxes. Given Mills' explanation for why he failed to sell the properties in Washington, D.C. when it became patently obvious he could not afford them while simultaneously paying his tax obligation, and his somewhat reduced lifestyle once he moved to Wichita, the Court cannot find that there is sufficient evidence to rule, as a matter of law, that Mills willfully failed to meet his tax obligations. The evidence presented in this motion may well turn out to be sufficient to establish willfulness at trial, but it is not sufficient for summary judgment.[51]

---

[50]Mills' wife stated in her deposition that her trainer was for "fitness" purposes, instead of health purposes, leaving a factual issue whether the trainer was medically necessary. *See* her deposition at page 94.

[51]*In re Loper*, 329 B.R. at 704 (reversing the bankruptcy court's decision to grant summary judgment on the basis that non-movant had presented some evidence of intent, and the court was required to construe that evidence, at the summary judgment stage, in the light most favorable to non-movant).

19

## IV. CONCLUSION

The Court finds that summary judgment cannot be granted with the evidence before it. IRS has outlined numerous purchases, transactions and expenses that do appear to be lavish, and the Court is struck by the amount of income Mills and his wife earned during the time when he was regularly not paying his taxes. That said, however, Mills has provided enough of an explanation for his lifestyle and living expenses that, when all reasonable inferences are viewed in the light most favorable to him, raise a factual question as to whether he willfully failed to pay his income taxes.

"[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[52] Accordingly, this issue must be decided as a factual matter following a full opportunity for both sides to present evidence to the Court as a trier of fact. Mills suggests his non-payment over twelve years was as a result of a "downward spiral" and that "despite his best efforts" he was unable to meet all his obligations. It will be this Court's job, after hearing all the evidence and assessing the credibility and demeanor of the witnesses, to determine why Mills, who appears to have had the wherewithal to pay his taxes, did not do so.

**IT IS, THEREFORE, BY THIS COURT ORDERED** that the Motion for Summary Judgment filed by the United States (Doc. 54) is denied. This matter is set for trial on the Court's stacked evidentiary trial docket to commence January 5-6, 2006.

###

---

[52] *Anderson v. Liberty Lobby*, 477 U.S. at 249.